You may proceed and begin your argument. May it please the Court. Counsel. Joni Thome on behalf of Appellant Tracy Harrell, Counsel. We're here before this Court today because the District Court made impermissible findings of fact at summary judgment, made determinations of credibility, and weighed evidence in favor of Handi Medical. It didn't consider evidence in a light most favorable to Tracy Harrell, as the Court must do under the summary judgment standard. I think the most egregious error the District Court made was when it decided that Handi Medical's CEO, Mr. Bailey, had an understandably hostile response to Harrell's complaints of discrimination. At the same time, discounted or ignored Ms. Harrell's understandable response to Bailey's hostile, threatening, and discriminatory words and actions. The District Court correctly found that, on the claims on appeal, that Harrell has demonstrated her prima facie case on both of these claims. So the central question of fact now is on pretext. There aren't really any, no decision was made as a matter of law. Just errors relative to the summary judgment standard. The universe of facts that are most critical for a jury to hear, to make a decision about whether discrimination and retaliation happened, happened in a period of about 15 minutes on August 11, 2015. Because in those moments, Tracy Harrell walked into a meeting for corrective action unknowingly, received the corrective action, tried to explain something more about what happened the day upon which she was accused of behaving unprofessionally in the workplace. And she made a report in response to Mr. Bailey's words. And Mr. Bailey blew up. Tracy Harrell cried. She was afraid. She went into the meeting afraid of the man. But Bailey, by his own admission, blew up. Everything changed as soon as Harrell made her report. Now, at trial, Tracy Harrell will have the opportunity to prove by proponents of evidence that this alleged legitimate reason for termination and for other adverse actions taken were not the real reasons as proposed by Handy Medical, but rather pretext for the discrimination. Well, the enriching lives, any reply to it, is not pretextual, right? The enriching lives comment that Harrell makes is in response to everything else that happened in that meeting. When we look at those 15 minutes, and we don't even have to look at anything that happened prior to that, Harrell is responding to Bailey's self-admitted, written, witnessed statements that were discriminatory and retaliatory. And he admits, and everybody in that room knew, that Tracy Harrell was being subjected to adverse actions. Three of them inside those few minutes. I think the real timeline... What do you say are the adverse actions? Well, we start with, if we go back, go back to August 5th, there's the meeting where things are going to change. And Harrell doesn't love it. And then she talks... The meeting is not an adverse action. No, the meeting in itself. And that's the August 5th one. Yeah, but tell me the adverse actions. What do you think the adverse actions are, if any, and which ones? Sure. And this is based on Bailey's testimony, Harrell's testimony, Lerner's testimony, Dieter's, Peterson's, and the notes. I think there are three critical documents. There's Bailey's statement that he writes post-meeting, August 11th meeting. There's Peterson's notes. There's their testimony. And there's the corrective action itself. She goes into a meeting, not... With no intention that she... Or understanding that she would be fired. Nobody thought she would be fired that day. Okay? First adverse action is when Harrell is explaining, I wasn't upset about the changes in the department. Here's what I was upset about. I was upset as I was leaving that day because I had talked with my husband about the changes in the workplace. And I had to go. Yeah, they let her go. And she left in a hurry. But then she's being accused of leaving in a huff, in a hurry, and swearing. But she explains, and everyone in that room knows, that Mr. Harrell has a disability. That Mr. Harrell has a mental illness. And Bailey says, the first thing he says is, why would you tell him if you knew it would upset him? So right there, he's saying something about what Mr. Harrell thinks. What Mr. Harrell's condition might bring about. My question was too simple. We know after she says enriching life, she's fired. Right. So that's an adverse action. Right. Do you think there's any other adverse actions? Yes. The first adverse action is the hostility that Bailey demonstrates. Boy, we've got no case that says hostility is an adverse action, do we? We do. We have Losey and we have Pye. Well, no, wait. Losey's different because there it wads up the actual complaint and throws it in. It's not the anger as much as taking the complaint, wadding up and saying, get out of my sight. In this case? Yeah. The anger comes right away from Miss Bailey. Well, to get out of my sight, though, doesn't occur until after the enriching lives. Okay. The second adverse action is the exit strategy. Because she says it. Is it just a potential? Those are the words of counsel for Handy. Let me ask a question. My question, again, very simple. What's the best authority that an exit strategy is an adverse action? Again, it's a threat. The best authority is the statute itself. The Minnesota Human Rights Act, the appraisal section talks about threats and intimidation, conditions of employment. Exit strategy at Handy means termination. Every witness in this case knows that. Tracy Harrell knew that. Bailey says it. He says in his notes he thought it best that if she felt that way, that he was discriminated against her, that she should work somewhere else. He wrote it, and he testified to that. Exit strategy was the second adverse action, the threat and termination. Can that not be a benign result of an adverse action discussion? Do employers ever work something out? We maybe have to do an exit strategy, but maybe we can work it out. You know, that's a question for the jury, right? Because in this company, they cite to one situation where somebody wasn't terminated. No second chances in this company? They cite to one situation where a person was going to be planning an exit strategy, and that person wasn't terminated. Bailey makes it clear by his notes that exit strategy means termination. Exit strategy means I'm being really nice here. I'm going to give the person four to six weeks to work here while they go find another job. He says because of you, your family, your complaints about my discriminatory behavior, my discriminatory comments, that's why you need to leave. The testimony is clear on this. The notes of Mr. Bailey are at appendix 35 and 36. When these notes are presented to a jury, they will see and hear that what Mr. Bailey says is that it was his opinion that if Tracy felt the way she was talking, she would be better off working somewhere else. There was a plan for that exit strategy to happen after the supervisor came back from his vacation. Had there been earlier instances where her performance was thought to be not up to par? Sure. But she wasn't fired and she didn't- What was the straw that broke the camel's back in this case? Her complaint. Her specific complaint about what? I believe you're using my husband's disability against me. In fact, had they done so in any overt or silent way? Doesn't matter. She can just determine in her own mind. That's how she felt in that moment. When Bailey was talking to her and telling her, why would you even tell him something that you knew would upset him? That is going into the conduct and the situation and the condition of her husband. That's marital status discrimination. Was it Mr. Bailey who got upset and red-faced? Yes, Mr. Bailey. Did that occur after her accusations against him? Yes. Entered an understandable, maybe not defensible, but an understandable reaction on his part? To reach that conclusion, you have- In the real world in which we live. In the real world in which we live, people complain about discrimination when it's happening to them. When it happened just like that, that's what happened to Tracy Harrell. In other words, there was no second chance, no prior warning that her conduct had been less than forthright? She wasn't on any corrective action plan before she entered that room. She entered that room not- What sealed her fate, finally? What sealed her fate? Making the complaints. About the adverse attitude toward her and her husband? About marital status discrimination, about using that against her, and about her persistence in making those complaints. Not once, twice, three times. Arguably, the third time she made a complaint was enriching lives. Imagine the jury sitting there and hearing that as she left the room, after being berated, she's crying. The man's in her face, spitting on her. Moves his chair to make a point and says, Don't you ever accuse me of discriminating against you on the basis of your husband's disability. Don't you ever do that. Shaking his finger in her face. She's crying. You said she wasn't on a corrective action plan before she entered the office. What's a corrective action plan? Is that like a performance improvement plan? Yeah. Was she put on that as part of the exit strategy? No. The corrective action form that she walked into was one that was talking about the manner in which she left the office that day. On the 5th. Oh, you mean when she was called to the office, it was to put her on that plan. Right. As a result of leaving. Yes. All right. And you're saying that's when she made the complaint. Now, my other question is, what is an adverse action under the Minnesota statute? Is there a clear case on that, on whether the Burlington Northern standard applies or whether it's something stronger than that? Any conduct on the part of the employer that dissuades somebody from making a complaint about discrimination. Well, that's the Burlington Northern standard, roughly. Right. I'm asking whether there's a case that says that is the standard. Because prior to Burlington Northern, you know, there were cases saying it had to be something that affected the terms and conditions of the claim. Well, say to the Barr v. Capella. Barr v. Capella, you think? Minnesota Supreme Court, yes. All right. And in that case, too, and to your point, Judge Wolman, the appellant does not have to prove the underlying discriminatory conduct to be true. That's what she felt. I was trying to reserve five minutes. You would, because I think we'll probably hear a different version from the hearing. I think it probably will. Thank you. I'm going to grant you an extra minute or so. Thanks. I appreciate that. I don't see that case cited in your brief, so if you have a citation for it, that might be helpful. Okay. We'll find it. Send us a 28-J letter under the rules, you know. Okay. Under Rules 28-J of the Rules of Appellant Procedure with a copy of the opinion, citation to your colleague or your opponent sent to us. Okay. Oh, actually, it's in your reply brief, so I found it now. Okay, so never mind. Never mind, right. Thank you. Counsel, you may proceed. Thank you, Your Honor. May it please the Court, Counsel, my name is Lee Lastovich. With me is Alyssa Toft. I want to raise the lectern a little bit. There seems to be a button on the side somewhere. Maybe it's as high as it can go. I'll help with my eyesight. Oh, okay, yes. Speak into the mic, of course. Thank you. You may proceed. Thank you, Your Honor. This case involves a summary judgment determination that should be affirmed because the foundation for that decision is the plaintiff's own testimony. Between the plaintiff's testimony and the established case law from this Court, Judge Thunheim, Chief Judge Thunheim, correctly determined that there was no pretext. Did the plaintiff's testimony make clear what an exit strategy was or was not at this company? Here's what the plaintiff said about an exit strategy. Keep in mind that the words exit strategy, those two words, are different from the context in which all the witnesses, including the plaintiff, said they were used. Here's what the plaintiff testified to in terms of the exit strategy. This is at the appendix of page 203. I asked her a very open-ended question about how did the meeting end. Okay, there's no deposition trickery going on. It's how did the meeting end. This is the plaintiff's testimony, page 198 of her deposition, appendix 203. They said that, you know, clearly Handy has made myself and my family unhappy. We're not happy, and so maybe we should, can find an exit strategy when Scott returns. This is what the plaintiff says. Maybe. That was the discussion, and that's out of her deposition. Well, keep going, keep going. He was going on vacation, and when he returns from vacation, we would talk about an exit strategy that would work nicely for everybody. Correct. And then I was told that I was dismissed. Dismissed from the meeting. And then if we continue on, as Your Honor rightly pointed out, I go back to it just to make sure. This is page 199 of her deposition. I say, when you left the office, did you believe, did you believe that you would be revisiting a potential exit strategy with Mr. Learned when he came back from vacation? Her answer, right. Unequivocally, she says, right. This is the plaintiff's own deposition testimony. She can never do better than this. Well, how does that hurt her? Because what we're saying here is they would discuss a potential exit strategy. Well, that could well mean that there's going to be an exit strategy, and there are various potentials as to what that strategy will be. It could mean a lot of things, Your Honor, but what it doesn't mean is an actionable adverse action. And here's why. In this company, this company has a history of not having exit strategies lead to termination. This is in the appendix at, our appendix at page 48. The human resources director testified about the fact that, hey, you know, sometimes people reconsider, they show remorse, and we welcome that back. Were any numbers put with the sometimes, or is that the testimony? I haven't looked at it. Pardon me, Your Honor? I'm behind Judge Colleton. I haven't really looked at it. Tell me, does the HR director put numbers on it, or is it just a sometimes? You know the testimony. When she was asked about it in her deposition, she gave that as an example. She gave one example where somebody was on an exit strategy and was able to work her way back into the company. This is correct, Your Honor. In her deposition, she gave one example. However, when it comes to this concept of an exit strategy, if we look at all the witnesses' testimony, including the plaintiffs, no one said, you're being put on an exit strategy, you're going to be out of here. Everyone talked about, look, if you're not happy here, if we're not happy, maybe we should talk about an exit strategy. And the critical point there is, that's not actionable. There were no changes to the terms. This is a matter of Minnesota law. Does the Barr case state what your opponent says? Does it say it's the Burlington Northern dissuade a reasonable person standard? Maybe not going to lunch with everybody might qualify. In Minnesota, if you look at the specific statutory language in Minnesota, generally speaking, we follow, Minnesota courts follow the federal courts on this. But here's what the statute says. It talks about refusing to hire, maintaining a system of employment, discharging an employee, or discriminating with respect to hiring, tenure, compensation, terms, so on and so forth. This is Minnesota statute section 363A.08 subdivision 2. You can't have people suing in federal court or state court when their boss is mean to them. You can't have people, there's no cause of action for talking about what might happen in the future. There's causes of action for talking about adversely affecting the terms and conditions of employment. Suppose the boss says, this isn't working out. We're going to have to work on an exit strategy in which you'll be leaving the company in six weeks. But in the meantime, we're going to work with you to help you get a new job or let you take time off to get a new job and so forth. Would that be an adverse action? The adverse action would come when that person is terminated. So you're saying even though they've announced that she'll be leaving in six weeks, there's no adverse action until she leaves? I don't think that's going to fly if Burlington Northern is the standard. There's no Minnesota case that says whether that's an adverse action or not. But I would put it in the context of the statute. If that's an adverse action, why isn't this case an adverse action? What's the difference? Because it absolutely didn't happen. There was no, you are going to be put on an exit strategy. There was no, you're gone in six weeks. There was no, we'll help you find a new job. Why isn't that a jury question as to what exit strategy meant? Because of the plaintiff's deposition testimony. This isn't a situation where the plaintiff is saying, they gave me my pink slip. And the employer is saying, no, we just talked about maybe an exit strategy. The plaintiff's own deposition testimony does her in on this case on every single material issue in the case. It comes down to those pages we were looking at at the beginning of your, if we think those should be interpreted to mean exit strategy is stronger than what you're saying, then it would be a jury question? No, Your Honor. Again, I go back to the fact that it would be a termination would be the adverse action. Because even in your hypothetical where the employer does spell out a timeline and all those things, things can change. Maybe the person comes in the next day and says, I'm really sorry. I didn't mean it. I'll be better. I'll do better. I won't complain anymore about discrimination. Well, keep in mind the undisputed facts of what happened here. This is an employee who has been warned repeatedly time and again throughout the course of her employment about her rude, unprofessional behavior. Well, if they'd fired her for that reason, then there wouldn't be any case. If it were clear that that were the basis for the termination. Well, this employer should not be penalized for giving this employee a second chance. And that's what they did. I mean, here's an employee. Here's the context. This is a big picture of this case. An employer complies absolutely with the letter of the law and gives this employee every request for leave that the employee asked for. Every single one. The employee makes zero complaints prior to being disciplined of any kind of discrimination. Zero. The employee has a history of doing things like hanging up on Handy's customers. Keep in mind, these people need medical supplies, and she's hanging up on them. She's being rude to coworkers. And on August 5th, she, according to her own testimony, blows up after a meeting where she disputes some of the changes that are going to happen with her department and says, I'm done with this. I'm out of here. I'm done right now. And refuses to talk to a coworker. In an area where she says she's certain there was customers present. Now, the employer, keeping in mind the good faith belief standard for the employer, the employer's investigation actually yields information that what she actually said was, I'm done with this shit. I'm out of here. You're going to have to talk to somebody else. And so, Your Honor. Is that an undisputed fact? The word shit is disputed. Well, why don't you give us what's undisputed since we're on a summary judgment. The undisputed fact is that the plaintiff says, I am done with this. I am out of here. Refuses to talk to a subordinate who is trying to ask her a question. And admits that she is visibly upset. This is appendix page 195. She says, I'm done. I've got to go. Is it fair to say you are visibly upset? Yes. Do you think it would be unreasonable for someone to suspect that you are quitting because you said you were done? I can see that. And this is right next to the customers. And she says, on page 194 of the appendix, page 165 of her deposition, the showroom is directly in front of my desk and I am confident there were customers there. So, once again, she blows up. They call her in. Do they terminate her? Is this a case where they're sick of her taking all this leave and so they pull the plug based on this last straw? No. They pull her in. They sit her down. They give her this corrective action and say no further instances will be tolerated. And undisputedly, it is only after she is in trouble once again that she says, I think you're using my husband's disability against me. That's critical. Counsel says, well, you know, the prior, all that matters is that 15 minutes. No, it doesn't. The history of her disciplinary record and the fact that it was only after she was in trouble and being disciplined actually, in the words of this court, makes this case an abuse of the anti-discrimination act. We certainly have cases that say you can't, if you're on your way out because of bad performance, you can't all of a sudden claim discrimination and protect yourself from termination. But the question here is whether the exit strategy coming right on the heels of the complaint about discrimination supports an inference that the complaint was really the reason for the adverse action. What do you say about that? Well, it was counsel's burden on summary judgment.  It was Harold's burden on summary judgment to come forward with some inference that this was intentional discrimination. Now, one case that I want to reference here, we've urged that the but-for standard applies, but here's what Harold had to show on summary judgment. Just confirmed by this court in a Minnesota Human Rights Act retaliation context. This is the Nagib v. Trimark decision issued last month, 218 U.S. App Lexus 25728. To prove pretext in a retaliation case, and this court's interpreting the Minnesota Human Rights Act, the plaintiff must both discredit the asserted reason for the adverse action and show the circumstances permit drawing a reasonable inference that the real reason for the adverse action was retaliation. What do they have? She felt that way. He got angry. And that's it. That's all they have. Keep in mind, Your Honors, if we needed another nail in this box, she was replaced, Tracy Harold was replaced by another employee who was also taking family leave. All right. And that in and of itself should put an end to the pretext analysis. The other thing about this here is... Well, it's not a claim that she was fired for taking family leave. I mean, right? The taking of the leave by itself isn't the alleged cause. In her original complaint, she claimed retaliation on the basis of taking medical leave. On the FMLA claim, that's what she's alleging? And the Minnesota Human Rights Act claim. Well, where does the claim come in about discrimination based on the husband's medical leave? So she had four counts. Three Minnesota Human Rights Act counts basically saying, from our perspective, the same thing. And then a family claim saying the same thing. Chief Judge Schoenheim dismissed all of them. They've only appealed counts one and three. But keep in mind, if the complaint that she's talking about is, you're using my husband's disability against me, and she was taking leave because of her husband's disability, it's all the same thing. Who's Michael Bailey, just for my information? He's the CEO of Handy Medical. He's the CEO. Right. Oh, he's the fellow who made the comments, right. Okay, for some reason I wasn't clicking. Well, what about his testimony where the plaintiff's lawyer says, question, exit strategy means termination, and he says, that's correct. Isn't that significant? It is, but it's more significant if you read the entire ‑‑ it's more significant. Isn't that enough to support an inference by a jury that exit strategy means termination if the CEO says that's correct? It's not, Your Honor. Okay, tell us why. Here's why. Because immediately above that, and you're looking at the page, immediately above that he says that he thought that we should talk about it. He thought we should talk about an exit strategy, right. And then counsel takes the two words and says, exit strategy means termination. And he says, yeah. But discussion of an exit strategy or discussion of a termination or discussion of a severance offer, talking about it is vastly different from the word termination, severance, or exit strategy. And that's what's lost in this case. And Chief Judge Thunheim credited the plaintiff's testimony on this. So what you're saying is if exit strategy does mean termination, the problem is that he didn't definitively say we're going to have an exit strategy, we're just going to discuss the possibility of one? According to the plaintiff and her testimony, that's exactly what happened. Well, we'll look at the record. What was the ‑‑ oh, yeah. The page that I was referring to from the plaintiff where she says maybe and then I return to it and say, so this is potential, is appendix 203, pages 198 and 199 of the appendix. I see my time is up. We respectfully ask for an affirmance. You mentioned that recent case of ours. Nagib. It's not in your briefs, of course. No, it's a September 11th. Well, have you sent us a 28J letter? No, Your Honor, and I apologize, but I'm happy to. Will you do that when you get back to the office? Yes, Your Honor. So we have it before us. We're presumed to know our own cases, but it's nice to have them before us. Yes, Your Honor, of course. Given the number of cases we've decided. Thank you. Thank you. Add another minute and a half at least, if that would be helpful to you. Yes, thanks. On the exit strategy and the certainty of the exit strategy, we also look at HR's notes. Ms. Peterson, that's at appendix 27 and 28. She recounts the meeting and her notes, and she says, Mike recommended we work on an exit strategy when Scott returns from his planned time away. And she does describe what an exit strategy means, four to six weeks, and on and on. So she, HR, understood that's what was going to happen. Okay? What about her testimony? What do you say about that? In her testimony, she doesn't veer from her notes. No, I'm talking about Harold's testimony. Oh, Harold's testimony. The testimony that your counterpart was citing. Right. For the proposition that it was not definitive. Well, you know, what Ms. Harold said was that she needed a job. She needed a job. And in those moments, she was upset. But she also understood, in her testimony, is that she understood what exit strategy means. Exit strategy in that company means termination. Everybody agrees to that. She understood that. And when counsel for Handy asked her, well, it was really just a potential, right? She does answer yes. But she also, in many other, and I'm sorry, I don't have that testimony right here in front of me right now, but in many other places in her testimony, she talks about that she understood that exit strategy means termination. Well, but what he's saying is it wasn't a decision to implement an exit strategy. It was just a possibility. We have to look. This has been switched around, okay? What's in Bailey's mind? What's in Peterson's mind? What is he communicating? What he's communicating by his own testimony is that we were going to do this. And when you look further at our reply brief, when we're asking him about what exit strategy means, he says termination. And so we ask him, you know, so did you fire her twice? His answer is no. But then he comes back around, and I said, but you wanted to sit down and talk with her about leaving the company. Yes, that's right. You had already told her she was leaving the company. We're going to talk about how we could make that transition that would be best for both parties. And what are you reading from there? This is in our appellate brief at page 5 and 6. Is that from the record? It's from Bailey's testimony, yes. Next question, you want it to transition out, right? His answer, yes. So what's in Bailey's mind, what his motivations are, he lays them out very plainly. And remember, one of the things that he references in his memo about the meeting, he even goes so far as to talk about how this letter that he wrote in 2014 that Harold referenced as being upsetting to her husband, he defends himself pretty vigorously in his memo saying, I don't know about, I knew he had a disability. I knew he had something with his mental capacity. I think maybe he was bipolar. I know psychologists, but I didn't see anything in that letter that ought to have upset him. So again, he's talking about Mr. Harold's thoughts, beliefs, situation, condition. And in all of that, that's what Harold was complaining about in that meeting. And Bailey recognizes it and acknowledges that she is complaining about his discriminating against her on the basis of her husband's situation. And that's when he blows up. Harold didn't blow up. And counsel's representation of Harold exploding on the day that she left work on August 5th is not how anyone described her on that day. Bailey blew, and everyone described him as that, red face spitting in her face to make a point that she crossed the line when she complained about the way he was discriminating against her. Very well. We have no further questions, so we thank you for your argument. Thank both sides for the arguments in the brief. The case is now submitted, and we will take it under consideration. Thank you.